## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELECTRONIC PRIVACY | ) | |
|     INFORMATION CENTER, | ) | |
| | ) | Case No. 1:13-cv-01961-KBJ |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES | ) | |
|     DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
|     Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE DISPUTE

Pursuant to LCvR 7(h), defendant, the National Security Agency ("NSA"), submits this

Statement of Material Facts as to Which There is No Genuine Dispute.

1.      By letter dated October 3, 2013, and received on October 18, plaintiff submitted a

FOIA request to the Department of Justice, National Security Division ("NSD").  *See* First Declaration

of Mark A. Bradley (ECF No. 9-1), ¶ 2.

2.      Plaintiff's FOIA request letter stated:

EPIC seeks all records related to the Attorney General's required semiannual reports
between 2001 and the present under 50 U.S.C. § 1846.
1. All reports made to the Permanent Select Committee on Intelligence in the House
   of Representatives and the Select Committee on Intelligence in the Senate,
   detailing the total number of orders for pen registers or trap and trace devices
   granted or denied, and detailing the total number of pen registers or trap and trace
   devices installed pursuant to 50 U.S.C. § 1843.
2. All information provided to the aforementioned committees concerning all uses of
   pen registers and trap and trace devices.
3. All records used in preparation of the above materials, including statistical data.

*See* EPIC Request, Exhibit A to Pl. Motion for Preliminary Injunction (ECF No. 3-2); Compl. ¶ 18;

Answer ¶ 18.

3.      By letter dated October 29, 2013, NSD acknowledged receipt of the request.  First

Bradley Decl. ¶ 3.

4.      By a subsequent letter dated November 5, 2013, NSD granted plaintiff's requests for

expedited processing and waiver of processing fees.  *Id.*

5.      In 2013, the Government declassified the existence of now-discontinued, FISC-

authorized bulk collection of Internet metadata pursuant to the FISA PR/TT provisions.  *See*

Statement of the Director of National Intelligence, *available at*

http://icontherecord.tumblr.com/post/67419963949/dni-clapper-declassifies-additional-

intelligence (last visited October 30, 2014).

4.      As the Director of National Intelligence has stated, the Government at one time

acquired bulk Internet metadata under orders issued by the FISC pursuant to FISA's pen

register/trap-and-trace provision.  *Id.*

5.      The data authorized for collection included certain dialing, routing, addressing,

and signaling information such as "to" and "from" lines in an e-mail, and the date and time an e-

mail was sent, but not the content of an e-mail or the "subject" line.  *Id.*

6.      The PR/TT devices collected large amounts of this transactional information, or

metadata, from certain telecommunications service providers, and the National Security Agency

("NSA") analyzed this metadata.  *Id.*

7.      The FISC's orders authorizing this collection required the Government to comply

with "minimization procedures" limiting the retention and dissemination of the metadata,

including a requirement of "reasonable articulable suspicion" that selection terms used to query

the bulk data were associated with certain identified foreign terrorist organizations.  *Id.*

8.      This program of bulk Internet metadata collection was terminated in 2011 after an operational review.  *Id.*

9.      The parties have agreed to further narrow the scope of issues in dispute.  Plaintiff does not challenge withholding of the names of government employees pursuant to FOIA Exemptions 6 and 7(C); twenty-five documents identified as "Preliminary case tracking report with handwritten notes used to compile reports to Congress;" eleven documents identified as "FISA PR/TT Applications;" a document identified as "Exhibit attached to Document 'Notice of Filing' describing NSA's use of a classified intelligence method in the conduct of the PR/TT program;" a document identified as "Detailed declaration concerning techniques and capabilities used in FBI investigations."  Second Bradley Decl. ("Bradley Decl.") ¶¶ 7-8.

10.      NSD searched for records responsive to plaintiff's FOIA request in NSD's Office of Intelligence, Oversight Section.  Bradley Decl. ¶ 6.

11.      Because of the Oversight Section's unique role as the NSD component in charge of preparing and submitting these productions to Congress, any NSD records responsive to the request would be found in that section.  *Id.*

12.       The Oversight Section maintains a working file for each semiannual report and Congressional production.  *Id.*

13.      Those working files contain, among other records, tracking reports used to compile the statistical information for the semiannual reports.  *Id.*

14.      As part of the search for records responsive to plaintiff's FOIA request, an Oversight Section staff member went through each of the working folders for the reports and productions submitted during the time span of the request, and he provided NSD FOIA with all records related to PR/TT devices, including any information provided to the House and Senate

Intelligence Committees concerning those devices and any records used in preparation of those materials. *Id.*

15.     The Government has withheld classified information on behalf of the NSA and pursuant to FOIA Exemption 1. *See* Bradley Decl. ¶ 7; Declaration of David J. Sherman ¶¶ 8-14, 20-81, 83-84.

16.     Defendant withheld information relating to the categories of electronic communications metadata collected under FISA PR/TT authority and FISC orders. Sherman Decl. ¶ 20.

17.     David J. Sherman is an original classification authority. Sherman Decl. ¶ 2.

18.     Mr. Sherman has determined that disclosure of the withheld information relating to the categories of electronic communications metadata collected under FISA PR/TT authority and FISC orders would reveal the scope of the now-discontinued bulk internet metadata collection program, including the Government's technological collection capabilities, and its successes (or failures) in collecting certain types of metadata. *Id.* ¶ 22.

19.     Mr. Sherman has determined that, because the Government is authorized to collect metadata under other authorities and may do so separate from the discontinued bulk program, revealing information about the scope of that discontinued program would allow adversaries of the United States today to take countermeasures and frustrate ongoing, individually targeted U.S. intelligence collection. *Id.* ¶ 23.

20.     Release of this information concerning the discontinued metadata collection program could be reasonably expected to cause exceptionally grave damage to national security and it is properly classified TOP SECRET. Sherman Decl. ¶ 22.

21.     The Government withheld information that would reveal the types of electronic

communications from which metadata was acquired in the discontinued bulk collection program. *Id.* ¶ 28.

22.     Mr. Sherman has determined that information concerning the types of electronic communications subject to metadata collection would shed light on the classified scope of the discontinued program and the Government's capabilities.  *Id.* ¶ 30.

23.     Mr. Sherman has determined that this would also permit adversaries of the United States to develop countermeasures that could be used to thwart not just email metadata collection, but also other types of communications collection and result in a loss of information crucial to the national security and defense of the United States.  *Id.*

24.     Mr. Sherman has determined release of this information could reasonably be expected to cause exceptionally grave damage to national security, and it is accordingly classified TOP SECRET and exempt from disclosure under FOIA.  *Id.* ¶ 29.

25.     The Government has withheld information relating to the identities of electronic communication service providers that were compelled to participate in the discontinued bulk internet metadata collection program.  *Id.* ¶ 35.

26.     Mr. Sherman has determined that confirming (or denying) a relationship between the NSA and any telecommunications or electronic communications service provider would "reveal to foreign adversaries whether or not NSA utilizes particular intelligence sources [the carrier in question] and methods and, thus, would either compromise actual sources and methods or reveal that NSA does not utilize a particular source or method."  *Id.* ¶ 37.

27.     This, in turn, would allow adversaries of the United States to avoid the Intelligence Community's surveillance.  *Id.* ¶¶ 37-39.

28.     Mr. Sherman has determined that revealing such information could reasonably be

expected to cause exceptionally grave damage to national security.  Sherman Decl. ¶ 36.

29.   The Government has withheld some dates and FISC docket numbers of records relating to the discontinued bulk internet metadata collection program.  *Id.* ¶ 44.

30.   The Government has acknowledged that the program was reauthorized by the FISC approximately every 90 days from its inception until its termination in December 2011, except for a brief period.  *Id.* ¶ 45.

31.   Mr. Sherman has determined that revealing the withheld docket numbers and dates would allow adversaries of the United States to "deduce or infer the time period for which the program was not operational, thereby determining which of their communications . . . may have escaped NSA collection and querying."  *Id.*

32.   This, in turn, would allow terrorists to ascertain, *e.g.*, which communication channels remain "safe."  *Id.* ¶ 46.

33.   Mr. Sherman has determined that this information is properly classified SECRET and it is therefore exempt from disclosure under FOIA.  *Id.* ¶ 47.

34.   The Government has withheld information regarding the specific facilities from which electronic communications metadata was collected.  Sherman Decl. ¶ 48.

35.   Although the bulk internet metadata collection program has been discontinued, Mr. Sherman has determined that "revealing which facilities [were] used for collection under that program would provide" adversaries of the United States with "unique insights into NSA's analytic process for identifying worldwide facilities for collection."  *Id.* ¶ 49.

36.   Mr. Sherman has determined that adversaries of the U.S. could apply such insights to develop countermeasures against other forms of surveillance.  *Id.*

37.   Mr. Sherman has also determined that such a disclosure would alert targets of

surveillance to which records NSA did and did not collect, so that they would know which communications were "safe." *Id.*

38.     Mr. Sherman has determined that this information is properly classified TOP SECRET and it is therefore exempt from disclosure under FOIA. *Id.* ¶ 50.

39.     The Government has withheld the identities of the targets from which communications were collected under the discontinued bulk internet metadata collection program. Sherman Decl. ¶ 51.

40.     Mr. Sherman has determined that disclosing specific targets of intelligence collection would identify which entities the Government believes are engaged in terrorism as well as the scope and limits of the discontinued bulk collection program. *Id.* ¶ 53.

41.     Mr. Sherman has determined that this, in turn, would allow terrorists to determine which past communications are, or are not, likely to have been captured, and cause those targets to take steps to circumvent future surveillance under other programs. *Id.*

42.     Mr. Sherman has determined that the release of surveillance target identities could reasonably be expected to cause exceptionally grave damage to national security. *Id.* ¶ 52.

43.     The Government has withheld information relating to the methods and techniques by which adversaries of the United States "attempt to conceal their communications to avoid detection and collection, otherwise known as their tradecraft," as well as "information concerning the threats posed by particular adversaries." Sherman Decl. ¶ 58.

44.     Mr. Sherman has determined that disclosure of such information could alert adversaries to the United States' awareness of those adversaries' countermeasures. *Id.* ¶ 60.

45.     Mr. Sherman has also determined that such disclosure could alert adversaries such as terrorists to the Government's awareness of particular threats to or plots against the nation. *Id.*

46.     That is because "adversaries know how they communicate and therefore, upon a disclosure of the government's awareness of specific examples of adversary tradecraft, targets would learn which of their communications may have been vulnerable to collection." *Id.*

47.     Mr. Sherman has determined that this information could help adversaries avoid ineffective tradecraft, and employ more effective tradecraft, and thus deny the United States crucial information. *Id.*

48.     Mr. Sherman has determined that release of this information could reasonably be expected to cause exceptionally grave damage to national security. *Id.* ¶ 59.

49.     The Government has withheld certain operational details of FISA PR/TT collection previously authorized by the FISC, although it has released others. Sherman Decl. ¶¶ 65-66.

50.     The withheld information includes, *e.g.*, details about equipment, collection capabilities, analytical techniques, and database names. *Id.* ¶ 65.

51.     Mr. Sherman has determined that this information would reveal NSA's technical capabilities to adversaries of the United States and allow them to develop countermeasures, frustrate intelligence collection, and enhance attempts to penetrate NSA networks. *Id.* ¶¶ 67-69.

52.     As Mr. Sherman has determined that release of this information could reasonably be expected to cause exceptionally grave damage to national security. *Id.* ¶ 67.

53.     The Government has withheld in full all Secondary Orders of the FISC issued during the discontinued PR/TT internet metadata bulk collection program. *Id.* ¶ 74.

54.     Mr. Sherman has determined that revealing these orders (each of which was directed to a specific communications provider being compelled to provide metadata) or

revealing even the number of orders could reasonably be expected to allow sophisticated adversaries of the United States to deduce the identities of the providers. *Id.* ¶ 75.

55.     Even attempting to redact the names of such providers where they are included in the orders would allow a sophisticated reader to determine the provider's identity "by looking at the length of the redacted[] material, and comparing any redacted Secondary Order with other declassified documents." *Id.*

56.     Mr. Sherman has determined that revealing which providers participated in the bulk internet metadata collection program could reasonably be expected to cause exceptionally grave damage to the national security. *See id.* ¶¶ 77, 37-39.

57.     The Government has withheld classified information on behalf of the FBI and pursuant to FOIA Exemption 1. *See* Bradley Decl. ¶ 7; Declaration of David M. Hardy ¶¶ 24-34.

58.     David M. Hardy is an original classification authority. Hardy Decl. ¶ 2.

59.     Defendant withheld information describing specific FBI intelligence activities or methods that are still used by the FBI today in gathering intelligence information. *Id.* ¶ 31[1]-33.

60.     Mr. Hardy has determined that the release of this information would inform hostile entities of the FBI's intelligence-gathering methods, reveal current, specific targets of FBI investigations, and reveal the criteria used and priorities assigned to FBI national security investigations. *Id.* ¶ 32.

61.     The documents at issue describing specific FBI intelligence activities or methods were originally submitted to the FISC in support of a Government application for an order

---

[1] Paragraph 31 of Mr. Hardy's declaration contains classified information so it has been redacted from the public version of that declaration filed via the Court's ECF system. The same is true of several classified footnotes in Mr. Hardy's declaration. A full, unredacted, classified copy of the declaration is being lodged with a Department of Justice Classified Information Security Officer for *ex parte* submission to and *in camera* review by the Court.

granting the installation and use of a PR/TT device to be used on particular targets of national security investigations. *Id.* ¶¶ 33-34.

62.     These documents contain specific descriptions of a particular FBI intelligence method and activity that, if revealed, would permit hostile entities to thwart the FBI's authorized use of that method. *Id.*

63.     Mr. Hardy has determined that release of this withheld information could reasonably be expected to "severely disrupt the FBI's intelligence gathering capabilities" and cause serious or exceptionally grave damage to national security. *Id.* ¶ 34.

64.     The Government has withheld classified information from twenty-five semiannual reports that the Attorney General has submitted to the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence, as well as the House and Senate Judiciary Committees.  Bradley Decl. ¶ 9.

65.     Mr. Bradley is an original classification authority. *Id.* ¶ 2.

66.     The semiannual reports discuss, *inter alia*, all PR/TT surveillances conducted under FISA from July 1, 2000 to December 21, 2012. *Id.* ¶ 9.

67.     The semiannual reports have been released in part. *Id.* ¶ 10.

68.     Summary descriptions of intelligence targets and investigations, which specifically describe national security investigations and how they are conducted, have been redacted from the reports released to plaintiff. *Id.*

69.     Mr. Bradley has determined that release of this information could reveal the targets of the investigations, "particularly to sophisticated observers including the targets themselves, because of other details provided." *Id.*

70.     Mr. Bradley has also determined that release of this information would reveal the techniques that the United States Intelligence Community employs in national security investigations.  *Id.*

71.     The Government has also withheld portions of the reports that contain summary descriptions of compliance incidents, which include details about United States intelligence methods.  *Id.*

72.     Mr. Bradley has determined that revealing those details could permit adversaries of the United States to circumvent intelligence collection and evade surveillance by the United States.  *Id.*

73.     The Government has withheld information about intelligence sources and methods from the semiannual reports released to plaintiff.  *Id.*

74.     The reports contain "specific descriptions of the manner and means by which the United States Government conducts foreign intelligence surveillance, and as such, the withheld information describes sensitive intelligence activities, sources, and methods."  *Id.*

75.     Mr. Bradley has determined that disclosure of this information would provide adversaries of the United States and foreign intelligence targets with insight into the Intelligence Community's capabilities, which could permit them to degrade and evade those capabilities.  *Id.* ¶ 10.

76.     Mr. Bradley has determined that such disclosure could therefore be reasonably expected to cause serious or exceptionally grave damage to national security.  *Id.*.

77.     The Government has withheld classified information on behalf of the CIA and pursuant to FOIA Exemption 1 from a single document, a Declaration of then-Director of Central Intelligence George Tenet, which was released in part.  *See* Bradley Decl. ¶ 7;

Declaration of Martha M. Lutz ¶¶ 5-15, 19-23.

78.     Ms. Lutz is an original classification authority.  Lutz Decl. ¶ 2.

79.     Ms. Lutz has determined that disclosure of the information withheld in the Tenet Declaration could be expected to lead to the identification of intelligence sources, methods, and activities of the CIA.  *Id.* ¶ 15.

80.     The information redacted from the Tenet Declaration relates to specific sources, methods, and activities used by the CIA to track and collect information on terrorist threats, and relates to the CIA's methods to corroborate and synthesize collected intelligence.  *Id.* ¶ 20.

81.     The Tenet Declaration provides numerous, detailed pieces of intelligence information along with details as to how that information was obtained, processed and analyzed. *Id.*

82.     Protection of the CIA's intelligence sources and methods is critical to its ability to provide the President and other United States policymakers with information and fulfill the agency's counterterrorism mission.  *Id.* ¶ 21.

83.     Ms. Lutz has determined that revealing the information redacted from the Tenet Decl., however, would allow terrorist groups to "exploit gaps in coverage" of CIA intelligence gathering and "defeat the specific collection efforts of the CIA[.]"  *Id.* ¶ 22.

84.     Ms. Lutz has determined that disclosure of the information withheld from the version of the Tenet Decl. released to Plaintiff could reasonably be expected to result in exceptionally grave damage to national security.  Lutz Decl. ¶ 23.

85.     The information redacted on behalf of the NSA from documents responsive to plaintiff's FOIA request relate to a function (signals intelligence) and the activities of the NSA. *See* Sherman Decl. ¶¶ 25 (categories of internet metadata collected, relating to function and

activities of the NSA); 32 (types of communications acquired under discontinued bulk PR/TT

program); 43 (identities of providers compelled to participate in discontinued bulk PR/TT

program); 47 (dates and FISC docket numbers associated with discontinued bulk PR/TT

collection program); 50 (facilities from which electronic metadata was collected); 55 (identities

of targets of intelligence collection); 62 (adversary tradecraft); 71 (operational details of

communications intelligence collection activities); 79 (FISC secondary orders authorizing NSA

communications intelligence activities).

86.    The NSA, CIA, and FBI invoke Section 102A(i)(1) of the National Security Act

of 1947, as amended, as justification to withhold information pertaining to intelligence sources

and methods.  *See* Sherman Decl. ¶ 17; Hardy Decl. ¶¶ 36-38; Lutz Decl. ¶¶ 16-18.

87.    The Government has invoked the National Security Act to protect various

intelligence sources and methods.  *See* Sherman Decl. ¶¶ 26 (categories of electronic

communications metadata collected under discontinued bulk PR/TT program, revealing

intelligence sources and methods); 33 (types of electronic communications acquired under

discontinued bulk PR/TT program, revealing intelligence sources and methods); 42 (identities of

telecommunications providers compelled to provide internet metadata, *i.e.*, intelligence sources);

49 (facilities from which metadata was collected, *i.e.*, intelligence sources); 56 (identities of

targets of PR/TT collection, which would allow targets to deduce intelligence sources); 63

(information about adversary tradecraft, which could permit adversaries to deduce intelligence

methods); 72 (operational details of discontinued bulk PR/TT collection program, *i.e.*,

intelligence methods); 80 (secondary orders, which would reveal the identities of providers

compelled to participate in the discontinued bulk PR/TT collection program, *i.e.*, intelligence

sources); Hardy Decl. ¶¶ 31-33, 35-36 (specific intelligence method); Lutz Decl. ¶¶ 17-20
(specific intelligence sources, methods, and activities of the CIA).

88.     The withheld portions of the Tenet Decl. contain information about CIA's core
functions, and in particular specific intelligence sources, methods, and activities used by the CIA
to protect the United States against terrorist threats.  Lutz Decl. ¶¶ 18, 20.

89.     The Government has withheld information concerning communications
intelligence activities of the United States.  Sherman Decl. ¶¶ 27 (categories of metadata
collected); 34 (types of electronic communications acquired); 43 (identities of providers from
whom communications intelligence was or is collected); 57 (identities of targets of
communications intelligence activities); 64 (information about adversary tradecraft, which would
reveal "the procedures and methods that the NSA uses to intercept communications"
intelligence); 73 (operational details of communications intelligence collection under
discontinued bulk PR/TT program); 81 (FISC secondary orders, which would reveal the scope of
communications intelligence collection program and methods by which NSA intercepts
communications intelligence).

90.     The government has withheld from the documents provided to plaintiff
information concerning a confidential law enforcement technique used by the Intelligence
Community in national security investigations, and details concerning that technique.  *See* Hardy
Decl. ¶¶ 31-32, 45-46, 51; Bradley Decl. ¶ 11.

91.     The Government has also withheld information concerning a second, confidential
law enforcement technique.  *Id.*

92.     The Government has withheld information concerning "methods the FBI uses to
collect and analyze information in connection with national security investigations," Hardy Decl.

¶¶ 47-48, and the dates and types of its investigations, which would reveal the types of activities that trigger a full vs. preliminary investigation *id.* ¶ 50.

93.     The Government has withheld portions of the FBI's 2008 Domestic Investigations and Operations Guide ("DIOG")  that instruct FBI employees "on the proper use of certain sensitive FBI procedures, techniques, and strategies for conducting investigations."  *Id.* ¶ 49.

94.     The withheld portion of the DIOG responsive to plaintiff's request for FISA PR/TT information identifies the procedures, techniques, and strategies at issue.  *Id.*

95.     Releasing such information would reveal sensitive, unknown uses of these specific techniques and procedures, permit criminals to predict how and when the FBI will respond to certain suspicious or criminal activities, and thus enable them to take countermeasures to thwart the FBI techniques, procedures, and strategies at issue.  *Id.*

96.     Mr. Sherman, Mr. Hardy, Mr. Bradley, and Ms. Lutz have attested that the Government has reviewed the withheld material and disclosed all non-exempt information that reasonably could be disclosed.  *See* Sherman Decl. ¶¶ 82-84, Hardy Decl. ¶¶ 52-53, Bradley Decl. ¶ 13, Lutz Decl. ¶ 24.

97.     The Government has reviewed the withheld material and disclosed all non-exempt information that reasonably could be disclosed.  *See* Sherman Decl. ¶¶ 82-84, Hardy Decl. ¶¶ 52-53, Bradley Decl. ¶ 13, Lutz Decl. ¶ 24.

//

//

//

//

//

Dated October 31, 2014                Respectfully submitted,

                                      JOYCE R. BRANDA
                                      Acting Assistant Attorney General

                                      RONALD C. MACHEN
                                      United States Attorney

                                      ELIZABETH J. SHAPIRO
                                      Deputy Branch Director

                                      ___/s/ Steven Y. Bressler_____
                                      STEVEN Y. BRESSLER
                                      Senior Counsel
                                      U.S. Department of Justice, Civil Division
                                      Ben Franklin Station, P.O. Box 833
                                      Washington, D.C.  20044
                                      (202) 305-0167
                                      Steven.Bressler@usdoj.gov

                                      *Counsel for Defendant*